**Leonard C. LEWIS, Appellant**

v.

**UNITED STATES, Appellee.**

No. 02–CM–1355.

District of Columbia Court of Appeals.

Argued Dec. 14, 2004.

Decided Dec. 31, 2007.

Charles H. Fitzpatrick, Washington, appointed by the court, for appellant.

Andrea Roth, with whom James Klein and Samia Fam were on the brief and supplemental briefs, for the Public Defender Service as amicus curiae.

Mary B. McCord, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, Kenneth L. Wainstein, United States Attorney at the time the first supplemental brief was filed, Jeffrey A. Taylor, United States Attorney at the time the second supplemental brief was filed (and currently), John R. Fisher, Assistant United States Attorney at the time the brief and first supplemental brief were filed, and Roy W. McLeese, III, Glen Donath, Margaret J. Chriss, Jessie K. Liu, and Valinda Jones, Assistant United States Attorneys, were on the brief and supplemental briefs, for appellee.

Before WAGNER, STEADMAN, and TERRY, Senior Judges.*

TERRY, Senior Judge:

After a non-jury trial, appellant was convicted of assault. With support from *amicus curiae*, the Public Defender Service, appellant seeks reversal based on, *inter alia*, the decision of the Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Specifically, appellant and *amicus* contend that certain out-of-court hearsay statements that were admitted into evidence at trial violated the Confrontation Clause as interpreted by the Court in *Crawford*. Thus, on appeal, he claims that the trial court erred in admitting the victim's statements as excited utterances. He also contends that the evidence was insufficient to permit the court, as trier of fact, to find that he committed the assault. We affirm.

I

At approximately 11:00 a.m. on June 10, 2002, Metropolitan Police Officer James Conway responded to a 911 call reporting that a man was assaulting a woman in a red car with temporary tags at 604 Kenyon Street, N.W. Officer Conway arrived at that address within minutes after receiving the radio broadcast of the 911 call. As he approached, he saw appellant walking away from a red Nissan. The officer

---

* Judge Wagner was Chief Judge of the court at the time of argument. Her status changed to Senior Judge on December 21, 2005.

Judge Terry was an Associate Judge of the court at the the time of argument. His status changed to Senior Judge on February 1, 2006.

also noticed that Sheila Coleman, who was seated in the front seat of the Nissan, had "a large amount of blood on her shirt" and "was bleeding from the head and face area" as the result of "multiple lacerations." He described Ms. Coleman as "excited," "crying," "agitated," "very emotional," and "very, very upset."

At trial, when asked by the prosecutor whether he spoke to Ms. Coleman, Officer Conway stated, "I did. I asked her if she needed medical attention. She said she did. I asked the dispatcher to send an ambulance to the scene. Then I asked her . . . what had happened, and who had done this to her." Later in his testimony, Officer Conway elaborated on his initial interaction with Ms. Coleman:

> [T]he first thing she kept saying, even before I could get [sic], if she needed help or not, she kept saying, he was trying to kill me. . . . She repeated it twice at that time. And I was like, you know, I said, who was trying to kill you, and she pointed to the defendant. She didn't give his name or anything at that time. And that's when I went into, well, you know, ma'am, do you need medical attention? . . . [S]he never said yes, but she, you know, she was sobbing, and she shook her head up and down at that time.

Officer Conway next asked Ms. Coleman, "What did he do?", and she replied, "He choked me, he kicked me, he hit me with his hand . . . and he just kept trying to kill me." When the officer then asked, "How did you get cut on your head?", Ms. Coleman responded, "He just picked me up by my shoulders and was . . . hitting me into the ground."

Meanwhile, Officer Donald Harris arrived on the scene and proceeded to interview appellant, who was sitting nearby on the curb. Appellant admitted to Officer Harris that he had slapped Ms. Coleman and knocked a "stem pipe" out of her mouth. He also stated that Ms. Coleman received her injuries by tripping over a cable in the parking lot while running away from him.

After his initial questioning, Officer Conway asked Ms. Coleman to step out of the car; she did so, and then sat down on the curb. Trying to calm her down, Officer Conway questioned her to "find out exactly where this happened, and . . . the whole situation as to . . . what happened before the assault, how did the assault occur. . . ." Ms. Coleman replied that the altercation began in a nearby alley and that she and appellant continued to argue when they returned to the car. While describing the incident, Ms. Coleman continued to repeat, "He was just trying to kill me."

Ms. Coleman did not testify at trial, but the government introduced her statements at the scene through the testimony of Officer Conway. When the officer began to recount the statements Ms. Coleman made to him while she was still seated in the car, defense counsel objected on the ground that the statements were inadmissible hearsay. Counsel subsequently renewed his objection, arguing further (1) that the statements Ms. Coleman made after she got out of the car were not excited utterances, and (2) that the admission of her statements violated the Confrontation Clause of the Sixth Amendment. The court ruled that all of the statements were admissible as excited utterances, and that no Confrontation Clause violation was apparent.

Relying on the testimony of the police officers and seven photographs of Ms. Coleman's injuries, the court found appellant guilty of assault. It specifically credited Ms. Coleman's first words to Officer Conway (while she was still seated in the car) as strong evidence that she had been assaulted, and found appellant's version of

events not to be credible. A few weeks later, the court imposed a sentence of 180 days' incarceration, suspended its execution, and placed appellant on probation for two years.

Appellant filed a timely notice of appeal. After the briefs were filed, the case was submitted without argument. Shortly thereafter, however, the Supreme Court of the United States issued its decision in *Crawford v. Washington.* Appellant filed a motion to allow supplemental briefing in light of *Crawford,* which we granted without opposition. Appellant, appellee, and *amicus* Public Defender Service filed briefs discussing the issues raised by *Crawford,* and the court in due course heard oral argument. Thereafter, while the case was still pending, the Supreme Court decided *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which it amplified its earlier holding in *Crawford.* At the parties' request, the court agreed to allow further briefing on the impact of the *Davis* decision and other "recent decisions of this court," particularly *Thomas v. United States,* 914 A.2d 1 (D.C.2006). The last of these additional supplemental briefs were filed in August 2007, and this appeal is now ready for decision.

## II

### A. *Excited Utterances*

■ "What constitutes a spontaneous utterance depends upon the facts peculiar to each case, and such utterance is admitted in the exercise of sound judicial discretion which is not disturbed on appeal unless clearly erroneous." *Nicholson v. United States,* 368 A.2d 561, 564 (D.C. 1977). Nevertheless, there are three factors which must be established before a statement may be admitted into evidence as an excited utterance. First, there must be a startling event which causes a state of nervous excitement or physical shock in the declarant; second, the declaration must be made within a sufficiently short period of time after the occurrence to ensure that the declarant did not reflect upon the event and possibly invent a statement; third, there must be circumstances which in their totality suggest the spontaneity and sincerity of the remark. *E.g., United States v. Woodfolk,* 656 A.2d 1145, 1150 (D.C.1995); *Price v. United States,* 545 A.2d 1219, 1226 (D.C.1988).

■ Appellant disputes that the second and third factors were established in this case. Specifically, he argues that the trial court erred in admitting Ms. Coleman's statements as excited utterances because (1) "the record is devoid of evidence of the time between the alleged assault and the statements made to the police," (2) "the complainant's statements were made in response to several questions from the police officer," and (3) Ms. Coleman "was likely intoxicated when she made the statements to the police."

Appellant's first claim fails because the case law sets no time limit for determining whether a statement qualifies as an excited utterance; what matters is whether the declarant is still under the influence of the startling event at the time the statement is made, regardless of how much time has passed. In this case Officer Conway arrived on the scene within minutes after receiving the radio run, and his testimony—describing Ms. Coleman as "excited," "crying," "agitated," and "very, very upset"—showed that she was still under the influence of the startling event. That was enough to make her statements admissible. *See Reyes–Contreras v. United States,* 719 A.2d 503, 505–506 (D.C.1998) (excited utterance admitted when statements were made thirty minutes after startling event when victim was crying and upset); *Smith*

v. United States, 666 A.2d 1216, 1223 (D.C. 1995) (excited utterance admitted when it was made no more than fifteen minutes after the startling event).

Appellant failed to raise at trial his third point—that Ms. Coleman was likely intoxicated—and in any event it offers no basis for reversal.[1] Even if, arguendo, appellant had made this assertion at trial, it would fail because intoxication affects only the weight of the evidence, not its admissibility. See Nicholson, 368 A.2d at 564 ("a high percentage of alcohol in the bloodstream of the victim goes only to the weight of the testimony rather than to the admissibility of the declaration"); accord, United States v. Glenn, 154 U.S.App. D.C. 61, 65, 473 F.2d 191, 195 (1972).

■ Only appellant's second argument—that the statements were made in response to questioning by the police—was raised at trial, and controlling case law compels us to hold that it is without merit. "[T]he fact that [a victim] made the statement in response to a question . . . is not proof that he reflected before speaking." Lyons v. United States, 683 A.2d 1080, 1083 (D.C.1996); accord, Young v. United States, 391 A.2d 248, 250 (D.C.1978) ("[t]he fact that the statement was made in response to an inquiry does not demonstrate a lack of spontaneity" (citations omitted)). We therefore hold that the trial court did not err in ruling that Ms. Coleman's statements were admissible as excited utterances.

### III

■ In addition to arguing that Ms. Coleman's statements to Officer Conway

were not excited utterances, appellant also contends that their admission violated the Confrontation Clause.

As the government acknowledges in its brief, appellant preserved his objection to the statements on Confrontation Clause grounds. Thus any constitutional error would require reversal unless the government can show beyond a reasonable doubt that the error was harmless because it did not contribute to the eventual verdict reached. Morten v. United States, 856 A.2d 595, 600–601 (D.C.2004). Therefore, to find harmless error, we must ask whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the errors[.]" Neder v. United States, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

While this appeal was pending, the Supreme Court decided the case of Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In Crawford the Court held that the trial court had erred when it admitted tape-recorded statements made by the defendant's wife to police officers during the course of an interrogation after the defendant was arrested and his wife had been read her Miranda rights. In so doing, the court overruled its prior holding in Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), that the admission of hearsay statements made by a witness who was unavailable which bore "adequate indicia of reliability" and "particularized guarantees of trustworthiness" did not violate the Confrontation Clause.[2] Id. at 66, 100 S.Ct. 2531. Crawford thus significantly changed the

---

1. Appellant testified at trial that he knocked "the stem" out of Ms. Coleman's mouth and had seen her smoking crack cocaine in his car prior to the assault.

2. While the Court, in overruling Roberts, declared that the Confrontation Clause's "ultimate goal is to ensure reliability of evidence,"

it held that "it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." Crawford, 541 U.S. at 61, 124 S.Ct. 1354.

law regarding hearsay exceptions by "announc[ing] a *per se* rule: the Confrontation Clause bars the government from introducing testimonial statements at trial against a criminal defendant without calling the declarant to testify in person, unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant, regardless of how reliable the testimonial evidence is perceived to be or whether it fits within a recognized hearsay exception." *Thomas v. United States*, 914 A.2d 1, 11 (D.C.2006).

Significantly, *Crawford* applies only to "testimonial" statements. However, the Court in *Crawford* chose not to define just what it meant by "testimonial." 541 U.S. at 68, 124 S.Ct. 1354.[3] Rather, it stated that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354. It also made clear that it was referring to "a specific type of out-of-court statement," which it identified as a "solemn declaration or affirmation made for the purpose of establishing or proving some fact," "a formal statement to government officers," or the like. *Id.* at 51, 124 S.Ct. 1354 (citation omitted). But the Court went on to say that "[s]tatements taken by police officers in the course of interrogations are also testimonial under even a narrow standard," *id.* at 52, 124 S.Ct. 1354 and added in a footnote that it was "us[ing] the term 'interrogation' in its colloquial, rather than any technical legal sense." *Id.* at 52 n. 4, 124 S.Ct. 1354 (citing *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)). This comment in turn raised a question about the precise meaning of "interrogation," which unfortunately the Court in *Crawford* did not answer either, except to say that "one can imagine various definitions of 'interrogation,' and we need not select among them in this case." 541 U.S. at 53 n. 4, 124 S.Ct. 1354.

*Crawford* thus left many questions unanswered. Since then, however, the Court has provided some clarification in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), in which it set out "to determine more precisely which police interrogations produce testimony." *Id.* at 2273. In the *Davis* opinion the Supreme Court considered two consolidated cases from different state courts: *Davis v. Washington*, involving a victim's statements made during a 911 call, and *Hammon v. Indiana*, No. 05–5705, involving a victim's statements made to police at the scene of the crime. In evaluating whether the statements at issue were testimonial, the Court provided the following standard:

> Statements are nontestimonial when made in the course of police interrogations under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis*, 126 S.Ct. at 2273–2274.[4] "Thus, the Supreme Court has defined 'testimonial' in

---

**3.** "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'" *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354 (footnote omitted).

**4.** In a footnote the Court added:

Our holding refers to interrogations ... because the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the

functional rather than categorical terms. Broadly speaking, the Court has focused in *Crawford* and *Davis* on the primary anticipated or intended use of the statement, not on whether the statement qualifies as an exception to the rule against hearsay or falls into some other arbitrary testimonial category." *Thomas,* 914 A.2d at 14.

Despite the more precise definition of "testimonial" provided by the *Davis* Court, "the line between testimonial and nontestimonial statements will not always be clear," and "each victim statement thus must be assessed on its own terms and in its own context to determine on which side of the line it falls." *United States v. Arnold,* 486 F.3d 177, 189 (6th Cir.2007) (en banc). Nevertheless, the Court's application of the definition to the two cases that it considered in *Davis* provides a useful guide for our consideration in the case at bar.

In *Davis,* the first of the two cases addressed by the Court, a 911 operator received an emergency call, but before anyone spoke, the connection was broken. The operator then called the number back and, after a woman answered, began asking a series of questions. In response, the caller, Michelle McCottry, described a situation in which she was being physically attacked by her former boy friend, Adrian Davis.[5] Police arrested Davis, and in due course he was charged with violation of a "domestic no-contact order." *Id.* at 2271. At trial the state's only witnesses were the two police officers who responded to the 911 call. They described the injuries that they saw on Ms. McCottry, but neither

officer could testify as to their cause. Ms. McCottry herself did not testify, and in her absence the trial court admitted a portion of the 911 call over Davis' objection. Ultimately, a jury found Davis guilty, and on appeal his conviction was affirmed by the Washington Court of Appeals and the Washington Supreme Court.

After granting Davis' petition for certiorari, the United States Supreme Court likewise affirmed, concluding that the statements made during the course of the 911 call were not "testimonial" and, therefore, that the admission of the 911 tape recording did not violate the Confrontation Clause. *Id.* at 2276–2277. The Court reasoned that "[a] 911 call ... and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 2276. Distinguishing the call from the situation presented in *Crawford,* the Court noted four primary differences: (1) Ms. McCottry "was speaking about events *as they were actually happening,* rather than 'describ[ing] past events' "; (2) unlike the situation in *Crawford,* the emergency was ongoing and was "plainly a call for help against bona fide physical threat[s]"; (3) the nature of the inquiries "was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford* ) what had happened in the past"; and (4) whereas the declarant in *Crawford* was calm and in a safe environment, Ms. McCottry was "frantic" and "in

---

absence of any interrogation are necessarily nontestimonial.
*Davis,* 126 S.Ct. at 2274 n. 1. Thus, while the purpose of any questioning is critical to the Court's analysis, the nature of the declarant's statement remains a significant factor.

**5.** After Ms. McCottry answered, the 911 operator first asked, "What's going on?", to which

McCottry responded, "He's jumpin' on me again." The operator followed with a series of questions, including "Are there any weapons?" and "Has he been drinking?", ultimately ascertaining the assailant's name. 126 S.Ct. at 2271.

an environment that was not tranquil, or even ... safe." *Id.* at 2276–2277 (emphasis in original).

*Hammon,* the companion case to *Davis,* also involved a domestic disturbance, but the statements at issue were obtained by police at the scene rather than by a 911 operator. Upon arriving at a house to investigate a report of a domestic disturbance, police officers encountered Amy Hammon on the front porch. Although she appeared frightened, she told the officers that "nothing was the matter." *Id.* at 2272. After obtaining permission to enter the house, the police found her husband, Hershel Hammon, in the kitchen. While one officer stayed with the husband, another officer interviewed the wife in the living room, eventually obtaining from her a signed affidavit describing a violent argument during which her husband hit her and threw her to the ground. When Mrs. Hammon failed to appear at trial, the judge allowed the prosecutor to offer Mrs. Hammon's oral statements and the affidavit into evidence, and Mr. Hammon was convicted of domestic battery. The Indiana Court of Appeals and the Indiana Supreme Court affirmed the conviction.

The Supreme Court reversed after concluding that Mrs. Hammon's statements were testimonial. The Court observed that when the police arrived, "[t]here was no emergency in progress"; the scene was calm, and there was "no immediate threat" to Mrs. Hammon. *Id.* at 2278. In questioning her, the officer "was not seeking to determine ... 'what is happening,' but rather 'what happened.' " *Id.* Like the declarant in *Crawford,* she was "actively separated from the defendant"; her statements "deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed," and the questioning "took place some time after the events described were over." Thus the court held that "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime...." *Id.*[6]

The Court rejected the notion that "virtually any 'initial inquiries' at the crime scene will not be testimonial...." However, the Court explicitly stated that it was "not hold[ing] the opposite—that *no* questions at the scene will yield nontestimonial answers." *Id.* at 2279 (emphasis in original). In particular, the Court cited its prior observation that in domestic disputes "[o]fficers called to investigate ... need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim," *id.* (quoting *Hiibel v. Sixth Judicial District Court,* 542 U.S. 177, 186, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004)), noting that "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements." *Davis,* 126 S.Ct. at 2279 (emphasis in original). The Court concluded, however, that "in cases like this one, where [Mrs. Hammon's] statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were 'initial inquiries' is immaterial." *Id.*

---

6. Similarly, in *Drayton v. United States,* 877 A.2d 145 (D.C.2005), a pre-*Davis* case interpreting *Crawford,* this court held that a victim's statements were testimonial when they were obtained by the police after the scene was secured. The assailant was handcuffed inside a patrol car, and "[i]t [did] not appear that there was any ongoing danger to the officers or the community, nor [was] there any indication that [the police] were evaluating the scene to determine if anyone needed immediate medical attention." *Id.* at 151 (citations omitted). Thus we concluded "that the officers ... were investigating a crime and fact-gathering in anticipation of potential future prosecution." *Id.*

In the present case, appellant argues that Ms. Coleman's statements were admitted in violation of the Confrontation Clause because they were "testimonial" within the meaning of *Crawford*. He contends that a declarant would be aware that statements that someone was trying to kill her would likely be used prosecutorially. More specifically, *amicus* argues that, at a minimum, when Ms. Coleman "told police that Mr. Lewis was trying to kill her while pointing toward him and describing the alleged assault in detail in response to questioning," it was "highly foreseeable" that "her accusatory words, establishing the facts of the alleged crime, would have punitive consequences." *Amicus* goes further and asserts that "criminal accusations made to police officers that establish the facts of a crime are inherently solemn and formal because they have solemn and formal consequences for the accused." We think it is clear from *Davis*, however, that *Crawford* cannot be read in such absolute terms, as the facts of this case demonstrate.

■ In applying the reasoning of *Davis* to the instant case, we must examine Ms. Coleman's statements separately, first considering the initial statements she made while sitting in the car, and then those that she made after she got out of the car and sat down on the curb. We conclude that the initial statements, recounting the basic facts of the assault, were non-testimonial because the primary purpose of Officer Conway's questioning was to enable him to respond most effectively to an "ongoing emergency." *Davis*, 126 S.Ct. at 2273.[7] However, we conclude that the more detailed account that Ms. Coleman provided a short time later, after she had alighted from the car and sat down on the curb, was testimonial because at that time the emergency had dissipated. Officer Harris had arrived on the scene by then, and appellant was detained a safe distance from Ms. Coleman; thus the police were no longer dealing with an ongoing emergency but investigating recent criminal conduct.

Ms. Coleman's initial statements while she was still in the car were made during an unresolved emergency. There is nothing in the record to indicate that these statements were made with the goal of providing "testimony," as that term is used in *Crawford* and *Davis*. Although in this case Ms. Coleman did not make her statements during a 911 call (as happened in *Davis*), the facts here make this case more analogous to *Davis* than to *Ham-*

7. *Amicus* argues that this case should be remanded for further fact-finding because Officer Conway gave "two conflicting accounts of his initial conversation with Ms. Coleman on the scene, and the judge never made any finding about which account was true." According to *amicus*, Officer Conway initially testified that he initiated the exchange with Ms. Coleman by asking her if she needed medical attention, but later changed his story and said that Ms. Coleman spoke first after the defense objected on the ground that a statement could not be an excited utterance if made in response to police questioning.

We are not persuaded that Officer Conway's testimony was in any way contradictory. The record makes clear that his initial testimony was in response to a question as to what *he* first said to Ms. Coleman. His later testimony that Ms. Coleman spoke first was in response to the trial court's question as to what *Ms. Coleman* said, and merely provided a more complete picture of his conversation with her. The intervening objection provided no motive for him to change his story, as the trial court correctly ruled that a statement could be an excited utterance even if made in response to police questioning. *See Lyons*, 683 A.2d at 1083. Moreover, even if Ms. Coleman did not speak until after Officer Conway questioned her, we have no reason to believe that our application of the "primary purpose" test articulated in *Davis* would require a different result under the circumstances presented here.

*mon.* The police did not seek out Ms. Coleman. Instead, Officer Conway found her "crying" and "agitated" only upon responding to a 911 call for assistance, apparently initiated by a citizen witnessing an assault in progress.[8] Although Officer Conway saw appellant walking away from the car and at some point ordered him to stop, the situation was uncertain and confused. Officer Conway, as yet unaccompanied by other officers, had no way of knowing whether appellant was the assailant or whether he might be armed. Under these circumstances, any reasonable observer would conclude that the situation presented an ongoing emergency. *See Arnold,* 486 F.3d at 190 ("No reasonable officer could arrive at the scene while the victim was still 'screaming' and 'crying' about a recent threat to her life by an individual with a gun and who was likely still in the vicinity without perceiving that an emergency still existed"); *United States v. Clemmons,* 461 F.3d 1057, 1060 (8th Cir. 2006) (holding that police were facing an ongoing emergency when they questioned the victim after finding him "lying in front of a neighbor's house, suffering from multiple gunshot wounds"); *People v. Bradley,* 8 N.Y.3d 124, 127, 862 N.E.2d 79, 81, 830 N.Y.S.2d 1, 3 (2006) (observing that, upon encountering a victim "emotionally upset" and "smeared with blood," the officer's "first concern could only be for her safety").

Given the ongoing emergency and Ms. Coleman's obvious distress, we are satisfied that her initial, spontaneous statements were clearly non-testimonial. *See Arnold,* 486 F.3d at 190 (observing that an unprompted statement "at least suggests that the statement was non-testimonial":); *State v. Warsame,* 735 N.W.2d 684, 692 (Minn.2007) (finding an initial, volunteered statement non-testimonial when it was

made under "obvious distress" with no indication that the declarant had prosecution in mind). That some of her statements were made in response to questions by the police does not transform the encounter into a testimonial interrogation, even in the broadest, most "colloquial" sense of the term. *See Crawford,* 541 U.S. at 52 n. 4, 124 S.Ct. 1354. The questions posed were not investigatory in nature, but were designed to gather information necessary to respond to the emergency. Such preliminary questions—"Who was trying to kill you?", "Do you need medical attention?", "What did he do?", "How did you get cut on your head?"—are routine inquiries that enable the police to assess the risk of danger, ensure the safety of the victim and the community, and secure any needed medical treatment. *See Arnold,* 486 F.3d at 190 (concluding that an officer's question asking victim to describe a gun "was to avert the crisis at hand, not to develop a backward looking record of the crime"); *Warsame,* 735 N.W.2d at 693 ("In order to [assess a party's injuries], officers must inevitably learn the circumstances by which the party was injured, and if the circumstances of the questions and answers objectively indicated that gaining such information is the primary purpose of the interrogation, then the party's statements are non-testimonial"). As in *Davis,* this preliminary inquiry was designed to gather the information necessary to secure the scene and resolve the emergency, not "simply to learn ... what had happened in the past." *Davis,* 126 S.Ct. at 2276. Under these circumstances, we cannot conclude that Ms. Coleman's excited statements while she was still in the car, made to a police officer within minutes of the officer's arrival in response to a 911 call, were "testimonial" within the meaning of *Crawford* and *Davis.*

---

8. The 911 call was not made by Ms. Coleman.

The statements that Ms. Coleman made after she got out of the car must be viewed differently. By that time Officer Harris had arrived; the scene was much less chaotic than when Officer Conway first found Ms. Coleman sitting in the car, "bleeding from the head and face area." The exigencies of the initial situation had subsided. Officer Conway had obtained sufficient information to respond to the emergency, and Officer Harris had detained appellant and was questioning him. As in *Hammon*, the scene had been secured and the parties separated. There was also a discernible change in the type of questions Officer Conway asked. Instead of questions designed to respond to the emergency, he began asking more detailed questions about how the assault occurred and what had happened before it began. We conclude, therefore, that the primary purpose of this second round of questioning was to investigate the incident in order to obtain information for use in a future prosecution. *See People v. Watson*, 14 Misc.3d 942, 827 N.Y.S.2d 822, 836–837 (N.Y.Sup.Ct.2007) (statement held to be testimonial when it was obtained after the scene had been secured and the assailant detained, and when its purpose was to aid police in compiling evidence for prosecution). Thus these statements were testimonial, and their admission contravened the Confrontation Clause. *See Drayton, supra* note 6, 877 A.2d at 150–151.

Although we conclude that the trial court erred in admitting the statements Ms. Coleman made after she alighted from the car and sat down on the curb, our inquiry is not yet complete. We must also determine whether the admission of these statements was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see Morten*, 856 A.2d at 600. We are satisfied that they were.

■ As soon as he arrived at the scene, Officer Conway found Ms. Coleman bleeding from multiple cuts to her head, and the admissible statements Ms. Coleman made while in the car identified appellant as her assailant and described the nature of the assault. Additionally, the government offered into evidence a piece of bloody clothing recovered from the car and seven photographs depicting the extent of Ms. Coleman's injuries. The trial court gave great weight to the photographs, finding that "these pictures tell us what [appellant] did." Moreover, as the court emphasized, appellant's testimony conceding that he "smacked the stem out of [Ms. Coleman's] mouth" was sufficient evidence independent of the statements to convict appellant of simple assault. *See Mahaise v. United States*, 722 A.2d 29, 30 (D.C.1998) ("Appellant's statement that he removed the phone from the complainant's hand and then took her cigarette from her other hand and extinguished it is then an admission, at least prima facie, of two separate assaultive acts"); *Comber v. United States*, 584 A.2d 26, 50 (D.C.1990) (en banc) (statute proscribing assault "is designed to protect not only against physical injury, but against all forms of offensive touching"). Thus appellant's admission to Officer Harris, along with the admissible statements of Ms. Coleman, the photographs, and the government's other evidence (*e.g.*, the officer's description of the scene), as well as appellant's own testimony, combined to make a powerful showing of appellant's guilt of the offense with which he was charged. The additional statements made by Ms. Coleman a few minutes later, while they provided corroborative details, did not add significant weight to the government's already strong case. We think it was highly unlikely that these later statements were so essential that they made a critical difference in the outcome of the trial; on the contrary, we

are satisfied that, even without them, the trial court would not have hesitated for a moment to find appellant guilty of assault. Thus we hold that the admission of the second set of statements by Ms. Coleman was harmless beyond a reasonable doubt.

## IV

■ Finally, appellant contends that the evidence was insufficient to support his conviction. This contention is without merit.

■ In considering a claim of insufficient evidence to support a conviction, this court views the evidence in the light most favorable to the government, keeping in mind the right of the trier of fact to assess credibility and to draw reasonable inferences from the evidence. *See, e.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C. 1991) (citing cases). In a case coming to us after a non-jury trial, such as this one, we will not reverse a conviction for insufficient evidence unless appellant establishes that the trial court's factual findings were "plainly wrong" or "without evidence to support [them]." D.C.Code § 17–305(a) (2001); *see Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992); *see also Lewis v. United States,* 767 A.2d 219, 222 (D.C. 2001) (a conviction will be overturned "only where there has been no evidence produced from which guilt may reasonably be inferred"). The case law does not distinguish between direct and circumstantial evidence, and "the government is not required to negate every possible inference of innocence." *Jones v. United States,* 625 A.2d 281, 288 (D.C.1993).

To convict someone of assault under D.C.Code § 22–404 (2001), the government must prove "(1) an act on the part of the defendant, (2) the apparent present ability to injure or frighten the victim, and (3) the intent to do the act that constituted the assault." *Lee v. United States,* 831 A.2d

378, 380 (D.C.2003) (citing *Macklin v. United States,* 733 A.2d 962, 964 (D.C. 1999)). Moreover, "intent [can] be inferred from doing the act which constituted the assault." *Smith v. United States,* 593 A.2d 205, 206 (D.C.1991) (citing *Robinson v. United States,* 506 A.2d 572, 575 (D.C.1986)).

Viewing the evidence in the light most favorable to the government, as we must, we hold that it was sufficient. As we have already discussed, even without the corroborative proof of Ms. Coleman's statements, appellant's statement that he knocked a "stem" out of Ms. Coleman's mouth was by itself sufficient to support an assault conviction. The photographs depicting Ms. Coleman's injuries and the bloodied evidence recovered from the car further bolster the conclusion that appellant committed an assault. Appellant has failed to show that any of the trial court's factual findings were plainly wrong or without support in the evidence.

## IV

For the foregoing reasons, appellant's conviction is

*Affirmed.*