# GOVERNMENT OF THE VIRGIN ISLANDS, Appellant
## v.
# GREGORY WILLIAMS and CLEMENT CONNOR, Appellees

D.C. Crim. App. No. 2004-130

District Court of the Virgin Islands

Division of St. Thomas and St. John

May 19, 2008

MAUREEN PHELAN, AAG, St. Thomas, U.S.V.I., *For the Appellant.*

ANDREW L. CAPDEVILLE, ESQ., St. Thomas, U.S.V.I., *For Appellee Gregory Williams.*

LEONARD BERNARD FRANCIS, ESQ., St. Thomas, U.S.V.I., *For Appellee Clement Connor.*

GOMEZ, *Chief Judge of the District Court of the Virgin Islands*; FINCH, *Judge of the District Court of the Virgin Islands*; and BRADY, *Judge of the Superior Court, sitting by designation.*

## MEMORANDUM OPINION

(May 19, 2008)

Appellant Government of the Virgin Islands (the "Government") appeals a June 17, 2004, order of the Superior Court of the Virgin Islands suppressing statements of the victim in a criminal proceeding. For the reasons stated below, the Court will vacate the order of the Superior Court and remand this matter.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 1, 2002, Appellees Gregory Williams ("Williams") and Clement Connor ("Connor") (collectively referred to as the "Appellees") rented a room at the Windward Passage Holiday Inn Hotel on St. Thomas, U.S. Virgin Islands. Later that day, the Appellees and another male individual exited the hotel and sat on the ledge of a glass window abutting the hotel lobby. The Appellees and the other individual began surveilling a young man sitting at a nearby bus stop. One of the men entered a red automobile while the other two blindfolded the young man at the bus stop and dragged him toward the car. The two men put the young man in the automobile and entered the automobile themselves. The automobile subsequently sped away.

Later that day, Officer Albion George ("Officer George") of the Virgin Islands Police Department responded to calls about a kidnapping in the vicinity of an area known as Windward Passage. George also received calls that a red vehicle had been observed heading toward an area known as Agnes Fancy. On arrival at Agnes Fancy, George found other police officers on the premises. The officers found an individual named Travis Poleon ("Poleon") conscious and lying face down with a gunshot wound. Poleon made certain statements to the officers before an ambulance arrived for him. Poleon later died from his wounds.

The Government charged the Appellees with offenses arising out of the kidnapping and shooting. The Government thereafter filed with the trial

957

court a pleading styled as a "Notice of Intent to Proffer the Statement of Victim Travis Poleon Pursuant to Federal Rules of Evidence 803(1), 803(2) and 804(b)(2)." The trial court treated the Government's notice as a motion to admit Poleon's statements to police officers. On March 3, 2004, the trial court issued an order, finding that Poleon's statements did not qualify as either a present sense impression under Rule 803(1) or a dying declaration under Rule 804(b)(2) of the Federal Rules of Evidence. The trial judge did, however, find that the statements were admissible as an excited utterance under Rule 803(2).

Following the trial court's ruling on the admissibility of Poleon's statements, the Government dismissed the case against the Appellees.[1] The Government thereafter filed a new information against the Appellees, alleging various murder, kidnapping, and firearms-related offenses arising from the same events that gave rise to the first proceeding. The Government again sought to introduce Poleon's statements. The Appellees filed a motion to suppress those statements. The trial court—this time with a different judge presiding over the matter—held a hearing on June 17, 2004.

At the hearing, Officer Michael Turnbull ("Officer Turnbull") testified that when another policeman, Officer Guishard ("Officer Guishard"), approached Poleon where he was found lying face down, Poleon's first words were, "What took all you so long?" [Appellant's App'x. at 126.] Officer Guishard asked Poleon what happened, and Poleon said he had been shot. [Id.] Officer Guishard then asked Poleon who had shot him. According to Officer Turnbull,[2] Poleon responded, "give me some water because I feel like I going die [sic]." [Id.] Officer Turnbull further testified that after drinking the water, Poleon appeared to be feeling better. [Id. at 120, 129.] Officer Guishard again asked Poleon who had shot him. Poleon responded "Marv." [Id. at 120, 126.]

The trial court also heard testimony from Officer George. Officer George testified that Poleon, covered in blood, said he had trouble breathing. Officer George stated, "He spoke as if he had severe pain and

---

[1] The record is unclear regarding the precise circumstances of the dismissal of the case. The record reflects only that the case "was dismissed without prejudice." [Appellants' App'x at 67.]

[2] Officer Turnbull's report about the events giving rise to the charges in this matter was filed one and a half years after the events. [Appellant's App'x at 123.]

he was constantly groaning stating that he cannot speak. He can't breathe well." [*Id.* at 101.] Officer George asked Poleon who had shot him. Poleon responded, "Marv." [*Id.* at 102.] George gave the following reason for asking Poleon that question:

> I saw his condition and from my experience I saw the desperation. I saw the wound that he had, the blood—the color of the blood. . . . His eyes was like rolling. He was in severe pain and I figured that he needed some immediate help.

[*Id.*] George also indicated that he thought that Poleon was possibly going to die.

After the hearing, the trial court issued a ruling on the admissibility of Poleon's statements. The trial court determined that those statements were testimonial, as contemplated by the Supreme Court's decision in *Crawford v. Washington,* and thus were inadmissible as an excited utterance.[3] The trial court also held that the statements were inadmissible as a dying declaration under Rule 804(b)(2) of the Federal Rules of Evidence. Specifically, the trial court found no evidence that Poleon was under the belief that his death was imminent, as required by that rule. Consequently, the trial court denied the Government's motion to proffer Poleon's statements and ordered that Poleon's statements be suppressed.[4]

The Government now appeals the trial court's ruling in the second proceeding against the Appellees. The criminal proceeding before the trial court has been stayed pending this appeal. In its appeal, the Government argues that Poleon's statements (1) are admissible under the doctrine of forfeiture by wrongdoing; (2) are nontestimonial; (3) are admissible as a dying declaration; and (4) are admissible as an excited utterance.

## II. DISCUSSION

### A. Jurisdiction

The Revised Organic Act gives this Court "appellate jurisdiction over the courts of the Virgin Islands established by local law to the extent now

---

[3] The Supreme Court's decision in *Crawford v. Washington,* 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), was issued on March 8, 2004, five days after the hearing on the admissibility of Poleon's statements in the first proceeding and the order of the trial court finding that Poleon's statements were admissible as an excited utterance.

[4] The trial court's ruling did not address the admissibility of Poleon's statements under any other hearsay exception.

or hereafter prescribed by local law." 48 U.S.C. § 1613a; *see also* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed V.I. CODE ANN. tit. 4, §§ 33-40, and reinstating appellate jurisdiction in this Court); Revised Organic Act of 1954 § 23A. Local law provides that the Government of the Virgin Islands may appeal an order suppressing evidence in a criminal proceeding when "not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information, if the Attorney General conducting the prosecution certifies to the Superior Court judge that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." V.I. CODE ANN. tit. 4, § 33(d)(2). In the Government's notice of appeal, the Attorney General made such a certification to the Superior Court.

## B. Standard of Review

A trial court's ruling on a motion to suppress is a mixed question of fact and law. *See, e.g., United States v. Guevara-Martinez*, 262 F.3d 751, 753 (8th Cir. 2001) ("When a district court grants a motion to suppress evidence, we review its findings of fact for clear error, and its conclusions of law de novo."). The Court reviews the trial court's factual determinations for clear error. *See In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000); *Soto v. Gov't of the V.I.*, 344 F. Supp. 2d 450 (D.V.I. 2004). The Court may reverse a factual finding based on "clear error" only where "that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data" or where the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *Georges v. Gov't of Virgin Islands*, 119 F. Supp. 2d 514, 520 (D.V.I. 2000). However, the trial court's application of the law is reviewed *de novo*. *See Soto*, 344 F. Supp. 2d at 453. Finally, to the extent the Court's review of the trial court's determination of admissibility implicates its interpretation of the Federal Rules of Evidence, the Court's review is plenary, but where the trial court's ruling was "based on a permissible interpretation of a rule," the Court reviews only for an abuse of discretion. *United States v. Peppers*, 302 F.3d 120, 137 (3d Cir. 2002); *United States v. Console*, 13 F.3d 641, 656 (3d Cir. 1993).

## III. ANALYSIS

Before addressing the Government's assertions that Poleon's statements are admissible under the forfeiture by wrongdoing, dying declaration or excited utterance hearsay exceptions, the Court must first determine whether Poleon's statements are testimonial or nontestimonial, as contemplated by *Crawford.*

█ "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED. R. EVID. 801(c). "Hearsay is generally inadmissible because the statement is inherently untrustworthy: the declarant may not have been under oath at the time of the statement, his or her credibility cannot be evaluated at trial, and he or she cannot be cross-examined." *United States v. Reilly,* 33 F.3d 1396, 1409 (3d Cir. 1994) (quotation omitted).

█ "In *Crawford v. Washington,* the Supreme Court interpreted the Confrontation Clause of the Sixth Amendment as barring the 'admission of testimonial statements of a witness who did not appear at trial unless he was available to testify, and the defendant had a prior opportunity for cross-examination.'" *United States v. Cannon,* 220 Fed. Appx. 104, 109 (3d Cir. 2007) (quoting 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). "[T]his outcome obtains regardless of whether the statement at issue falls within a firmly rooted hearsay exception or has a particularized guarantee of trustworthiness." *United States v. Hendricks,* 395 F.3d 173, 178-79, 46 V.I. 704 (3d Cir. 2005) (citation omitted). "In sum, insofar as 'testimonial' evidence is concerned, *Crawford* replaced the malleable judicial inquiry . . . with a virtually *per se* rule of exclusion." *Id.* at 179 (citing *United States v. Saget,* 377 F.3d 223, 226-27 (2d Cir. 2004) ("It is clear that a court faced with an out-of-court testimonial statement need not perform the *Roberts* reliability analysis, as *Crawford* replaces that analysis with a bright-line rule drawn from the historical origins of the Confrontation Clause.")).

The Supreme Court subsequently explained the meaning of "testimonial" in the context of statements made to the police:

> █ Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances

objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 547 U.S. 813, 126 S. Ct. 2266, 2273-74, 165 L. Ed. 2d 224 (2006). The Third Circuit has expounded on the Supreme Court's explanations in *Davis:*

> ██[T]estimonial statements describe *in hindsight* how past events began and progressed. Such statements are akin to live, in-court statements made by a witness on direct examination. In contrast, nontestimonial statements describe events that are presently unfolding and alert police to a dangerous situation that requires resolution. They can manifest themselves as cries for help or descriptions of present circumstances requiring police assistance.

*Cannon*, 220 Fed. Appx. at 109 (emphasis in original) (internal citations omitted).

██ The *Crawford* Court referenced three "formulations of . . . 'testimonial' statements": (1) *"ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *United States v. Hinton*, 423 F.3d 355, 359 (3d Cir. 2005) (internal citations omitted).

██ In *Davis v. Washington,* the Supreme Court held that a declarant's statements are testimonial if they relate to a past criminal occurrence relevant to a later criminal prosecution where there is no imminent threat of danger to the declarant. *See Davis*, 126 S. Ct. at 2273. However, the *Davis* Court also specifically declined to set forth any bright-line rule for determining whether initial inquiries at the scene of a crime necessarily elicit testimonial or nontestimonial statements. *Id.* at 2279 ("Although we

necessarily reject the . . . implication that virtually any 'initial inquiries' at the crime scene will not be testimonial, we do not hold the opposite—that no questions at the scene will yield nontestimonial answers.") (citations omitted).

In this matter, the trial court concluded that Poleon's statements were testimonial. During the hearing on the motion to suppress, the trial court noted:

> I find and I have concluded that this was an interrogation. I do not agree with the government that you have to be in custody, and the custodial interrogation, these statements were made in response to police questions and the Court finds that there were police interrogations and the Court finds that these statements are in fact testimonial accounts and therefore *Crawford* attaches . . . .

[Appellants' App'x at 88.]

This Court cannot agree that Poleon's statements were testimonial because those statements do not fall within any of the three formulations of testimonial statements set forth by the *Crawford* Court. The first two formulations are obviously inapplicable in this case—Poleon's statements are in no way the functional equivalent of in-court testimony or statements contained in formalized testimonial materials. Thus, only the third formulation is potentially applicable. For the reasons given below, the Court does not find that Poleon's statements fall within that broad formulation, either.

■ Although the *Davis* Court refined the definition of what constitutes a "testimonial" statement, "the line between testimonial and nontestimonial statements will not always be clear," and "each victim statement thus must be assessed on its own terms and in its own context to determine on which side of the line it falls." *Lewis v. United States*, 938 A.2d 771, 778 (D.C. 2007) (quoting *United States v. Arnold*, 486 F.3d 177, 189 (6th Cir. 2007) (en banc), *cert. denied*, 128 S. Ct. 871, 169 L. Ed. 2d 736 (2008)). Despite the lack of a clear definition of "testimonial" versus "nontestimonial" statements, an examination of *Davis* and its companion case offers guidance.

In *Davis*, someone placed a call to a 911 operator. The connection was lost before anything was said. The 911 operator traced the number, called back and began asking several questions of the person who answered the

call. The caller, Michelle McCottry, stated that she was being attacked by an ex-boyfriend, Adrian Davis. The police arrived and arrested Davis. At trial, the government called the police officers who responded to the 911 call. McCottry did not testify. On the government's motion, the trial court admitted a portion of McCottry's 911 call. Davis was found guilty of a domestic violence-related offense.

The Supreme Court affirmed Davis's conviction. The Court found that McCottry's statements during the 911 call were not "testimonial" and thus posed no Confrontation Clause problem. *Davis*, 126 S. Ct. at 2276-77. Specifically, the Court found that "[a] 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to establish or prove some past fact, but to describe current circumstances requiring police assistance." *Id.* at 2276.

The Court distinguished the facts in *Davis* from those in *Crawford.* First, McCottry "was speaking about events as they were actually happening, rather than 'describ[ing] past events.'" *Id.* Second, the emergency in *Davis* was ongoing and was "plainly a call for help against a bona fide physical threat." *Id.* Third, "the nature of what was asked and answered in Davis, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past." *Id.* (emphasis in original). Finally, remarking on "the difference in the level of formality," the Court noted that the declarant in *Crawford* was calm and in a safe environment, where as McCottry was giving "frantic answers . . . in an environment that was not tranquil, or even . . . safe." *Id.* at 2277.

*Davis*'s companion case, *Hammon v. Indiana*, No. 05-5705, also involved a domestic disturbance. In *Hammon,* however, police obtained the declarant's statements at the scene rather than by telephone. On arrival at the scene, police officers found the victim, Amy Hammon, on the porch of her home. She appeared "somewhat frightened," but said that "nothing was the matter." *Id.* at 2272. The police then entered the home and found Amy's husband, Hershel Hammon, in the kitchen. One of the officers stayed with Hershel while a second officer went to the living room to interview Amy. That second officer had Amy "fill out and sign a battery affidavit." *Id.* Amy later failed to appear as a witness. At trial, over defense counsel's objection, the trial court allowed the government to

submit the affidavit into evidence. The trial judge found Hershel guilty of battery.

The Supreme Court reversed Hershel's conviction on the ground that Amy's statements were testimonial. The Court reasoned that "[t]here was no emergency in progress"; "Amy told them that things were fine"; and "there was no immediate threat to [Amy's] person." *Id.* at 2278. The Court further noted that in interviewing Amy, the police officer

> was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer should have done. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* (emphasis in original).

In applying the Supreme Court's guidance in those cases to the facts in this matter, the Court finds the Sixth Circuit's decision in *United States v. Arnold* instructive. In *Arnold,* the victim, Tamica Gordon, called 911 after her mother's boyfriend, Joseph Arnold, had pulled a gun on her. Gordon explained to the operator that she had left the premises in her car and was calling from around the corner. Police officers were thereafter dispatched to the address Gordon had provided. Gordon went back to the premises and "approached the officers, 'crying,' 'hysterical,' 'visibly shaken and upset,' and exclaimed that Arnold had pulled a gun on her and was trying to kill her." *Arnold,* 486 F.3d at 180. Gordon then identified Arnold to the officers and described the gun he had pulled on her. The trial court allowed Gordon's 911 call and subsequent statements to be admitted under the excited utterance exception. Arnold was convicted of being a felon in possession of a firearm.

In affirming Arnold's conviction, the Sixth Circuit explained that "it may often be the case that on-the-scene statements in response to officers' questions will be testimonial because the presence of the officers will alleviate the emergency . . . ." 486 F.3d at 190. The *Arnold* Court continued to explain that the facts of that case did not fall within that general rule for several reasons. For example, the court noted that the defendant

remained at large; he did not know that [the victim] had called 911; and for all [the victim] (or the officers) knew [the defendant] remained armed and in the residence immediately in front of them or at least in the nearby vicinity.

*Id.* In agreeing with the trial court that Gordon's statements could be admitted an excited utterance, the Sixth Circuit concluded that Gordon's statements were nontestimonial, reasoning that officers described "distress" in the Gordon's voice and attempted to calm her down. *Id.* These facts, the court reasoned,

> suggested that the engagement had not reached the stage of a retrospective inquiry into an emergency gone by. No reasonable officer could arrive at a scene while the victim was still "screaming" and "crying" about a recent threat to her life by an individual who had a gun and who was likely still in the vicinity without perceiving that an emergency still existed. And nothing that [the victim] told them, and certainly nothing about the way she told it to them, would have allayed concerns of a continuing threat to [the victim] and the public safety, to say nothing of officer safety.

*Id.*

The facts of the case before this Court are akin to those in *Hammon.* The testimony of the proceeding before the trial court shows that the police were facing "an ongoing emergency." *See Davis,* 126 S. Ct. at 2273. Officer George testified that he was responding to radio calls of a recent kidnapping, and that when he found the automobile that had allegedly been used to abduct Poleon, "[t]he hood was warm." [Appellant's App'x at 99.] That the emergency was ongoing is further evidenced by the fact that the police found Poleon "lying . . . face down" and "in desperate need of help," and observed that "he had difficulty in breathing . . . ." [*Id.* at 101.] *See, e.g., Martin v. Michael,* Civ. No. 06-1383, 2007 U.S. Dist. LEXIS 38069, at *9 (W.D. La. Mar. 29, 2007) (finding statements nontestimonial where the victim "was having trouble breathing and was in considerable distress"). Moreover, Poleon "spoke as if he had severe pain and he was constantly groaning stating that he cannot speak." [Appellant's App'x at 101.] Finally, Poleon's "hands were all bloody and full of dirt." [*Id.*] Under these circumstances, any reasonable observer would have concluded that Poleon and the police

were facing an ongoing emergency. *See, e.g., Arnold*, 486 F.3d at 190; *United States v. Clemmons*, 461 F.3d 1057, 1060 (8th Cir. 2006) (holding that police were facing an ongoing emergency when they questioned the victim after finding him "lying in front of a neighbor's house, suffering from multiple gunshot wounds"); *Lewis*, 938 A.2d at 781 (finding statements nontestimonial where police found the declarant "crying" and "agitated" and where "the situation was uncertain and confused"); *People v. Bradley*, 8 N.Y.3d 124, 862 N.E.2d 79, 81, 830 N.Y.S.2d 1 (2006) (observing that, upon encountering a victim "emotionally upset" and "smeared with blood," the officer's "first concern could only be for her safety").

Furthermore, Poleon's statements to police officers "were not made in the context of a structured, formal investigation intended 'to establish or prove past events potentially relevant to later criminal prosecution.'" *See, e.g., Long v. United States*, 940 A.2d 87, 97 (D.C. 2007) (quoting *Davis*, 126 S. Ct. at 2274). The police officers first asked Poleon his name, and then asked who had shot him. In light of the fact that the automobile was found in close proximity to Poleon and was still warm, it seems that those questions were not part of a formal investigation, but rather were intended "to find out what had caused the injuries so that [the officers] could decide what, if any, action was necessary to prevent further harm." *See, e.g., Bradley*, 862 N.E.2d at 81 ("Asking [the victim] 'what happened' was a normal and appropriate way to begin . . . ."); *see also Long*, 940 A.2d at 97 ("Although any experienced police officer is undoubtedly aware of the possibility that any information he gleans may ultimately become evidence, building a prosecution is not the motivation for preliminary questions that are asked in response to an emergency situation."). "Viewed objectively, [the officers'] questions were designed to find out whether there was any continuing danger and to respond to the situation with which he was confronted." *See, e.g., Long*, 940 A.2d at 98; *Head v. State*, 171 Md. App. 642, 912 A.2d 1, 12 (2006) (finding that a police officer's question, "Who shot you?" was not intended "to establish or prove past events for possible use at trial"); *State v. Warsame*, 735 N.W.2d 684, 693 (Minn. 2007) ("In order to [determine the extent of a party's injuries], officers must inevitably learn the circumstances by which the party was injured, and if the circumstances of the questions and answers

objectively indicated that gaining such information is the primary purpose of the interrogation, then the party's statements are non-testimonial").[5]

In a similar vein, the record demonstrates that the police officers questioned Poleon at the scene of a very recent crime while he was prostrate in a bushy area. The Court fails to see how that description falls within the normal definition of a custodial setting. *See, e.g., People v. King*, 121 P.3d 234, 240 (Colo. Ct. App. 2005) (holding that where the statements were made to police in a noncustodial setting, without indicia of formality, and while the victim was under considerable pain and distress, the statements could not be viewed by any reasonable person as being made with the expectation that they would be used prosecutorially and thus were nontestimonial), *cert. denied*, No. 05SC179, 2005 Colo. LEXIS 941 (Colo. Oct. 17, 2005). Indeed, aside from Poleon's comment to police—"what took you so long" [Appellant's App'x at 126]—there is only scant evidence in the record that "[a]n 'objective witness' reasonably would have believed that [Poleon's answer, "Marv,"] served the purpose of incriminating [the Appellees] and would be available for use at trial." *Cf. United States v. Hinton*, 423 F.3d 355, 361 (3d Cir. 2005) (finding statements testimonial where the victim identified his assailant while riding with the police in their cruiser); *Lopez v. State*, 888 So. 2d 693, 700 (Fl. Dist. Ct. App. 2004) (holding that an accusation made by the victim to police at the scene of the crime was testimonial because the declarant "surely must have expected that the statement he made to [the officer] might be used in court against the defendant. He knew [the officer] was

---

[5] The Second and Ninth Circuits also have suggested, although only in dicta, that statements made by a victim to the police in the immediate aftermath of an emergency situation would not qualify as "testimonial" under *Crawford. See Mungo v. Duncan*, 393 F.3d 327, 336 n.9 (2d Cir. 2004) (doubting that responses "delivered in emergency circumstances to help the police nab [the victim's] assailants . . . were the type of declarations the [Supreme] Court would regard as testimonial"), *cert. denied*, 544 U.S. 1002, 125 S. Ct. 1936, 161 L. Ed. 2d 778 (2005); *Leavitt v. Arave*, 383 F.3d 809, 830 n.22 (9th Cir. 2004), *cert. denied*, 545 U.S. 1105, 125 S. Ct. 2540, 162 L. Ed. 2d 277 (2005). Similarly, the First Circuit has reasoned that "ordinarily, statements made to the police while the declarant or others are still in personal danger cannot be said to have been made with consideration of their legal ramifications," and are thus nontestimonial. *See United States v. Brito*, 427 F.3d 53, 62 (1st Cir. 2005). Moreover, "a number of state courts have considered whether statements made to the police during 911 calls or immediately upon their arrival at the scene of an ongoing or recent crime or emergency were testimonial, with most concluding that they were not." *United States v. Hadley*, 431 F.3d 484, 505 (8th Cir. 2005) (compiling cases).

a policeman who was on the scene in an official capacity to investigate a reported crime."), *cited with approval in Hinton*, 423 F.3d at 361 n.2.

Like the victim in *Arnold,* Poleon was evidently in distress—the recent victim of a shooting and possibly of forcible abduction. The record does not reflect that either he or the police knew of the perpetrators' whereabouts. Indeed, any reasonable observer would have concluded, as in *Arnold,* that safety was on the mind of both Poleon and the police officers, and that nothing that Poleon told the officers, "and certainly nothing about the way [he] told it to them, would have allayed concerns of a continuing threat." *Arnold*, 486 F.3d at 190.

■ In sum, Poleon's statements to police officers were made during an ongoing emergency. The police officers took those statements while responding to that emergency. Finally, Poleon's statements were "not the solemn and formal statements that one typically associates with testimony." *See, e.g., Long*, 940 A.2d at 98. For these reasons, the Court finds that those statements were not "testimonial," and therefore do not trigger the protections of the Confrontation Clause.

## IV. CONCLUSION

For the reasons stated above, the Court finds that the trial judge erred by finding that Poleon's statements were testimonial. Accordingly, the Court will remand this matter to the Superior Court for a determination whether Poleon's statements are admissible under any hearsay exception. An appropriate judgment follows.