**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**ALGERNON C. PHILLIP, Defendant**

Criminal No. F239/2009

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

February 17, 2010

JESSE M. BETHEL, JR., ESQ., Assistant Attorney General, Virgin Islands Department of Justice, St. Thomas, USVI, *Attorney for the Plaintiff.*

GEORGE H. HODGE, JR., ESQ., Law Offices of George Hodge, Jr., St. Thomas, USVI, *Attorney for the Defendant.*

HOLLAR, *Judge*

## MEMORANDUM OPINION

### (February 17, 2010)

This matter came on for a suppression hearing on Wednesday, November 4, 2009. The People of the Virgin Islands appeared through the Office of the Virgin Islands Department of Justice, Assistant Attorney General, Jesse M. Bethel, Esq. Defendant was present and represented by George Hodge, Jr., Esq. At the hearing, the Court heard sworn testimony from Marshal Dale Brathwaite and Defendant Algernon Carline Phillip. Closing arguments were made by counsel for the parties, after which, the Court reserved its ruling on Defendant's motion to suppress. All parties were instructed to submit memoranda on the sole issue as to whether the taking of bullets from *within* the Defendant's pocket constituted an illegal search and seizure. On November 9, 2009, Defendant submitted a Response. The People submitted its Supplemental Brief and Restatement of Supplemental Brief on November 13, 2009 and November 20, 2009, respectively.

## I. BACKGROUND AND PROCEDURAL POSTURE

On or about May 15, 2009 at approximately 7:00 p.m. Marshal Dale Brathwaite (hereafter "Marshal Brathwaite")[1] received a 911 dispatch call regarding gunshots that were fired in the Smith Bay area. (Trial Transcript dated November 4, 2009 at pp. 4-5). According to the 911 dispatcher, vehicles, traveling at a high rate of speed, were heading westward toward the Fort Mylner area.[2] (Trial Transcript dated November 4, 2009 at p. 5). In response to the 911 call, Marshal Brathwaite traveled to the Roy Lester Schneider Hospital (hereafter "RLSH"). (Trial Transcript dated November 4, 2009 at p. 6). Upon arriving at RLSH, Marshal Brathwaite observed a speeding car enter the RLSH's parking lot carrying what appeared to be one (1) gunshot victim. (Trial Transcript dated November 4, 2009 at p. 6). After approximately ten (10) minutes. Marshal Brathwaite observed a second and third car speed into the RLSH's parking lot. (Trial Transcript dated November 4, 2009 at p. 13). The second car contained another gunshot victim. (Trial Transcript dated November 4, 2009 at pp. 13-14). After the gunshot victim was removed from the second car, the third car, driven by Defendant Algernon Carline Phillips (hereafter "Defendant"), entered the RLSH's parking lot but remained parked for a couple "minutes."[3] (Trial Transcript dated November 4. 2009 at pp. 18-19). Defendant's actions aroused Marshal Brathwaite's suspicion because Defendant never entered the hospital to ascertain the status of his comrades. Instead, Defendant was on his cell phone while parked and prior to his attempt to exit the RLSH's parking lot. Before reaching the exit, Marshal Brathwaite "stopped" the vehicle to inquire about Defendant's presence on RLSH's premises. (Trial Transcript dated November 4, 2009 at p. 19). Defendant's responses

---

[1] On the date in question, Marshal Dale Brathwaite had been a law enforcement officer for over fifteen (15) years. Additionally, as a Virgin Islands Superior Court Marshal, Dale Brathwaite possessed peace officer status with the authority to enforce any laws or violations of Virgin Islands statutes. (Trial Transcript dated November 4, 2009 at p. 4).

[2] The vehicles were believed to be carrying gunshot victims. (Trial Transcript dated November 4, 2009 at pp. 6; 16).

[3] Although Marshal Brathwaite testified at the November 4, 2009 suppression hearing that Defendant's vehicle entered the RLSH's parking lot and remained parked for "minutes" before attempting to leave the area, that assertion was conspicuously absent from the sworn probable cause fact sheet dated March 18, 2009. (Trial Transcript dated November 4, 2009 at pp. 18-19); (Probable Cause Fact Sheet dated May 18, 2009).

along with what was previously observed and the totality of the circumstances heightened Marshal Brathwaite's suspicions that a crime was taking place or afoot. (Trial Transcript dated November 4, 2009 at p. 19). Defendant was then ordered out of his vehicle. While standing at the rear of his car, Marshal Brathwaite subjected Defendant to a *Terry* frisk and/or "pat down" for officer protection and/or safety. (Trial Transcript dated November 4, 2009 at pp. 19; 73). The "pat down" yielded no weapons. (Trial Transcript dated November 4, 2009 at p. 19).

At this juncture, testimony of Marshal Brathwaite and the Defendant differed as to the *manner* in which Defendant was detained and questioned. Marshal Brathwaite testified that a weapon was not drawn on the Defendant while he was being detained. Additionally, Marshal Brathwaite testified that Defendant was not interviewed in handcuffs. The Defendant, however, testified that upon being stopped at the exit of RLSH's parking lot, a law enforcement officer, *not* Brathwaite, approached his vehicle "jogging" with a weapon drawn and ordered him out of his car. (Trial Transcript dated November 4, 2009 at p. 42). Defendant further stated that while being interviewed as to his reason for traveling to RLSH, there were several officers present who placed handcuffs on his right hand while a law enforcement officer proceeded to search his vehicle, pat him down and search inside his pant's pocket. (Trial Transcript dated November 4, 2009 at pp. 42-45; 51-53). Although Marshal Brathwaite's affidavit is bereft of certain statements and/or assertions testified to at the suppression hearing, the parties' agree that *Defendant was stopped and/or detained by a law enforcement officer and was not free to leave at any point during his detention.* (Trial Transcript dated November 4, 2009 at pp. 67-68; 72).

During the "pat down," Marshal Brathwaite testified that he felt what seemed to be bullets in Defendant's pant pocket and, after asking "what's this in your pocket?", Defendant was ordered to remove the items from his pocket. (Trial Transcript dated November 4, 2009 at pp. 19-20). At the November 4, 2009 suppression hearing, Defendant testified that upon Marshal Brathwaite feeling bullets in his front left pant pocket, he [Marshal Brathwaite] "pushed his hand in [Defendant's] pocket but didn't pull the bullets out." (Trial Transcript dated November 4, 2009 at pp. 63-64). Defendant further stated that Marshal Brathwaite ordered him [Defendant] to empty his pockets and he complied with said instruction. (Trial Transcript dated November 4, 2009 at p. 64), After removing .38

32

caliber bullets from his pocket, Defendant placed the ammunition on top of his vehicle. (Trial Transcript dated November 4, 2009 at p. 20). Marshal Brathwaite then searched Defendant's car and located a .38 caliber firearm in a "makeshift compartment" in the driver's door panel. (Trial Transcript dated November 4, 2009 at pp. 11; 53-54). Marshal Brathwaite testified that Defendant consented to the search of his vehicle. (Trial Transcript dated November 4, 2009 at p. 10). In stark contrast, Defendant asserted that law enforcement officers began searching his car prior to him being "patted down." (Trial Transcript dated November 4, 2009 at pp. 42-45; 51-53). Forensics was subsequently summoned to remove and collect the firearm. (Trial Transcript dated November 4, 2009 at p. 71). Thereafter, Defendant was arrested advised of his constitutional rights and transported to the Richard Callwood Command Center where he was processed and taken to the Bureau of Corrections in lieu of Twenty-Five Thousand Dollars and 00/100 ($25,000.00) bail (Probable Cause Fact Sheet dated May 18, 2009 at p. 1). A National Crime Information Center (NCIC) and local firearm record check revealed that the .38 caliber firearm found within Defendant's vehicle was stolen from a residence on March 18, 2009 and that Defendant was not authorized and/or otherwise licensed to possess a firearm within the U.S. Virgin Islands. (Probable Cause Fact Sheet dated May 18, 2009 at p. 2).

On May 18, 2009, Defendant was taken before a judge where probable cause was found for his arrest. Defendant was arraigned on Thursday, May 28, 2009. In a one (1) count Information, the People charged Defendant with possession of an unlicensed firearm, in violation of V.I. CODE ANN. tit. 14 § 2253(a). The Defendant, through his counsel, pled "Not Guilty" to the charge and demanded a trial by jury. On June 22, 2009, counsel for Defendant moved to suppress "all statements and/or evidence derived from the unlawful search and seizure of Defendant." Additionally, defense counsel argued that "all evidence of weapons, ammunition and marijuana found in defendant's vehicle must be suppressed as fruits of an illegal search and seizure pursuant to *Wong Sun v U.S.*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The People filed its Opposition on July 29, 2009.

## II. STANDARD OF REVIEW FOR A MOTION TO SUPPRESS

█ The Fourth Amendment protects citizens from "*unreasonable* searches and seizures*" of "their persons, houses, papers and effects." U.S.

CONST. amend. IV.[4] The first clause of the Fourth Amendment protects citizens from governmental intrusions where the citizens have a reasonable expectation of privacy. There is a presumptive requirement that searches or seizures be carried out pursuant to a search warrant. *See Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). A search warrant must be obtained from a neutral and detached magistrate based "upon probable cause, supported by oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see United States v. Acosta*, 965 F.2d 1248, 1251 (3d Cir. 1992); FED. R. CRIM. P. 41. A search warrant must be "reasonable" and pursuant to some recognizable exception.

The task of the magistrate, who issues a search warrant, is simply to make a practical common-sense decision whether there is a fair probability that contraband or evidence of a crime will be found in a particular place, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, *See Illinois v. Gates*, 462 U.S. 213, 235, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); *see also Hill v. California*, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971) ("[S]ufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . ."). *See United States v. Charles*, 290 F. Supp. 2d 610, 614 (D.V.I. 1999); *see also United States v. Mark*, 48 V.I. 769 (D.V.I. 2007).

A trial court's ruling on a motion to suppress is a mixed question of law and fact. *See, e.g., United States v. Guevara-Martinez*, 262 F.3d 751, 753 (8th Cir. 2001) ("When a district court grants a motion to suppress evidence, we review its findings of fact for clear error, and its conclusions of law de novo."). *See In re Cendant Corp Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000); *Soto v. Gov't of the V.I.*, 344 F. Supp. 2d 450, 46 V.I. 363 (D.V.I. App. Div. 2004); *Government of the Virgin Islands v. Williams*, 49 V.I. 955 (D.V.I. 2008). The Court may reverse a factual finding based on "clear error" only where "that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data" or (3) where the reviewing court on the entire evidence

---

[4] The Fourth Amendment is made applicable to the Virgin Islands by the Revised Organic Act of 1954 (as amended), § 3; 48 U.S.C §§ 1541-1645.

is left with the definite and firm conviction that a mistake has been committed. *Georges v. Government of Virgin Islands*, 119 F. Supp. 2d 514, 520 (D.V.I. App. Div. 2000). However, the trial court's application of the law is reviewed *de novo*. *See Soto*, 344 F. Supp. 2d at 453.

Finally, to the extent the Court's review of the trial court's determination of admissibility implicates its interpretation of the Federal Rules of Evidence, the Court's review is plenary, but where the trial court's ruling was "based on a permissible interpretation of a rule," the Court's review is only for an abuse of discretion. *United States v. Peppers*, 302 F.3d 120, 137 (3d Cir. 2002); *United States v. Console*, 13 F.3d 641, 656 (3d Cir. 1993).

## III. ANALYSIS

The issues to be resolved by this Court are: (1) whether Marshal Brathwaite's "stop" of Defendant for investigatory purposes was lawful; (2) whether Marshal Brathwaite's "frisk" and/or "pat down" of Defendant's outer garments for weapons was lawful; (3) whether Marshal Brathwaite's "exploratory" search of Defendant's pocket and the subsequent removal of bullets contained therein was constitutional; (4) whether Marshal Brathwaite's protective search of the vehicle driven by Defendant was lawful but for the intervening, impermissible "exploratory" search of Defendant's pocket; and (5) whether the firearm seized from the vehicle became a "fruit of the poisonous tree" and therefore excluded and suppressed as evidence.

### A. MARSHAL BRATHWAITE'S "STOP" OF DEFENDANT FOR INVESTIGATORY PURPOSES WAS LAWFUL.

The first issue to be decided is whether Marshal Brathwaite's initial "stop" of Defendant for investigatory purposes was lawful. In the renowned case of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the U.S. Supreme Court addressed the implications of an officer's reasonable "seizure" and subsequent search of a defendant's person. The facts of *Terry* and the Supreme Court's ultimate ruling therein are crucial and controlling in the instant matter. In *Terry*, the petitioner and a codefendant were arrested and formally charged with carrying concealed weapons after an officer executed an investigatory stop and a limited and/or protective search for weapons of the suspects' outer clothing. *Id.* Prior to the investigatory stop however, the officer stated that

when he saw the petitioner and his codefendant, the men "didn't look right to [him]." *Id.* at 1871. The officer had been a policeman for 39 years, 35 years of which he served as a detective and for 30 of those 35 years he was assigned to patrol downtown Cleveland, with the targets being shoplifters and pickpockets. *Id.* As a result, the officer indicated that he had developed routine habits of observation. *Id.*

It was this "routine habit of observation" that called the officer's attention to the measured pacing, peering and conferring between petitioner and two other individuals outside a nearby corner store. *Id.* at 1872. The officer testified that he decided to further investigate the matter because the men's actions made him "thoroughly suspicious" and he suspected the men of "casing a job" or being in the process of a "stick up." *Id.* The officer also stated that he feared the men had [a] gun(s). *Id.* Upon approaching the men and identifying himself as a law enforcement official, the officer inquired as to the men's names.[5] *Id.* After the men "mumbled something" in response to the officer's inquiries, the officer conducted a limited and/or protective search for weapons of the men's outer garments. This "frisk" and/or "pat down" yielded two (2) .38-caliber revolvers and bullets. *Id.*

Petitioner and codefendant filed a pretrial motion to suppress the items seized and the trial court denied the motion. *Terry*, 88 S. Ct. at 1868-1870. The prosecution therefore introduced the items seized into evidence. The men waived a jury trial and pleaded not guilty. *Id.* The court adjudged both men guilty and sentenced them accordingly. *Id.* The Court of Appeals affirmed and the Supreme Court of Ohio dismissed the men's appeals on the ground that "no substantial constitutional question" was involved. *Id.* Upon grant of certiorari, the U.S. Supreme Court affirmed the men's convictions and held that the officer's "search [was] reasonable under the Fourth Amendment, and any weapons seized may properly be introduced in evidence against the person from whom they [the weapons] were taken." *Terry*, 88 S. Ct. at 1885.

---

[5] At this point, the officer testified that he was not acquainted with any of the men by name or sight and had not received any information concerning them from any other source, *Terry*, 88 S. Ct. at 1872.

■ Whenever an officer "stops" an individual and restrains his freedom to walk away,[6] the individual is deemed "seized" and the entire rubric of a law enforcement officer's conduct and/or swift action predicated upon the "on-the-spot observations" of that officer while "on the beat" must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures. *Terry*, 88 S. Ct. at 1879; U.S. CONST. amend. IV. Therefore, the governmental interest that justified the official intrusion upon the constitutionally protected interests of Defendant must be preliminarily assessed. *Terry*, 88 S. Ct. at 1879-1880; *Camara v. Municipal Court*, 387 U.S. 523, 534-535, 536-537, 87 S. Ct. 1727, 1735, 18 L. Ed. 2d 930 (1967).

■ In justifying Marshal Brathwaite's particular intrusion into Defendant's constitutionally protected interests, specific and articulable facts must be shown which, when taken together with rational inferences from those facts, reasonably warrant the intrusion.[7] *Terry*, 88 S. Ct. at 1880. *See also Beck v. State of Ohio*, 379 U.S. 89, 96-97, 85 S. Ct. 223, 229, 13 L. Ed. 2d 142 (1964); *Ker v. State of California*, 374 U.S. 23, 34-37, 83 S. Ct. 1623, 1632, 10 L. Ed. 2d 726 (1963); *Wong Sun v. United States*, 371 U.S. 471, 479-484, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963); *Rios v. United States*, 364 U.S. 253, 261-262, 80 S. Ct. 1431, 1437, 4 L. Ed. 2d 1688 (1960); *Henry v. United States*, 361 U.S. 98, 100-102, 80 S. Ct. 168, 171, 4 L. Ed. 2d 134 (1959); *Draper v. United States*, 358 U.S. 307, 312-314, 79 S. Ct. 329, 3 L. Ed. 2d 327 (1959); *Brinegar v. United States*, 338 U.S. 160, 175-178, 69 S. Ct. 1302, 93 L. Ed. 1879 (1949); *Johnson v. United States*, 333 U.S. 10, 15-17, 68 S. Ct. 367, 371, 92 L.Ed. 436 (1948); *United States v. Di Re*, 332 U.S. 581, 593-595, 68 S. Ct. 222, 229, 92 L. Ed. 210 (1948); *Husty v. United States*, 282 U.S. 694, 700-701, 51 S. Ct. 240, 242, 75 L. Ed. 629 (1931); *Dumbra v. United States*, 268 U.S. 435, 441, 45 S. Ct. 546, 549, 69 L.Ed. 1032 (1925); *Carroll v. United States*, 267 U.S. 132, 159-162, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *Stacey v. Emery*, 97 U.S. 642, 645, 24 L.Ed. 1035 (1878).

---

[6] The parties in the case *sub judice* concede that Defendant was not free to leave at any point during his detention. (Trial Transcript dated November 4, 2009 at pp. 67-68, 72).

[7] It is imperative that the facts be judged against an objective standard. *Carroll v. United States*, 267 U.S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925); *Beck v. State of Ohio*, 379 U.S. 89, 96-97, 85 S. Ct. 223, 229, 13 L. Ed. 2d 142 (1964). In other words, the facts available must warrant a man of reasonable caution to believe that the action taken by the officer, at the moment of the seizure or the search, was appropriate. *Id.*

■ The principles articulated in the litany of authority cited thrust to the fore the everyday governmental interest underlying this matter — efficient crime prevention and/or detection. When Marshal Brathwaite stopped Defendant, he, [Marshal Brathwaite], had already heard the 911 transmission announcing that gunshots were fired in the Smith Bay area and that vehicles, traveling at a high rate of speed, were heading westward toward the Fort Mylner area. In response, to the transmission. Marshal Brathwaite traveled to the RLSH and observed a speeding car enter the RLSH's parking lot carrying what appeared to be a gunshot victim. Further, Marshal Brathwaite had observed a second and third car speed into the RLSH's parking lot. The second car contained another gunshot victim. Following the gunshot victim being removed from the second car, the third car, later identified as the vehicle driven by Defendant, pulled into the RLSH's parking lot and remained parked for a couple "minutes." Defendant testified that he parked in the RLSH's parking lot and did not go into the hospital with the "victim," ostensibly his "friend," because he was on his cellular phone with another friend who was allegedly at football practice at the Charlotte Amalie High School and had requested a ride. (Trial Transcript dated November 4, 2009 at pp. 37-38). Isolated, there is nothing unusual about cars driving to hospitals and dropping off injured and/or sick individuals. Nor is there anything abnormal and/or "suspicious" about individuals parking their vehicles in a hospital's parking lot. However, the totality of the circumstances and/or the chain of events that occurred in this case converted the otherwise "innocent" acts into suspicious activity that warranted Marshal Brathwaite to reasonably conclude that criminal activity may be "stirring" and afoot.

■ In *Terry*, the Supreme Court defined the phrase "investigatory stop" and declared such stops and/or seizures of defendants by law enforcement officials "constitutional" if certain facts are specific and articulated by the officer. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The facts, however, cannot be a "mere form of words." *Id.* An "investigatory stop" occurs when an officer observes unusual conduct which leads him to reasonably conclude, in light of his experience, that criminal activity may be afoot. *Id.* The officer may then stop the individual(s) to investigate the behavior and make certain inquiries in order to dispel his reasonable suspicion. *Id.* Here, Marshal Brathwaite did just that. Specifically, after receiving the 911 dispatch call and observing Defendant's "suspicious" activity in the RLSH's parking lot. Marshal

Brathwaite stopped Defendant in order to investigate Defendant's behavior and dispel his reasonable suspicion. Marshal Brathwaite, a law enforcement officer, having approximately fifteen (15) years experience as a Virgin Islands Superior Court Marshal, possessed peace officer status with the authority to enforce any laws or violations of Virgin Islands statutes. Indeed, it would have been "shoddy" and/or ineffective law enforcement for a marshal with such substantial experience in crime prevention and/or detection to neglect investigating the suspicious activity occurring on the night in question. Therefore, the totality of the circumstances on or about May 15, 2009 warranted Marshal Brathwaite's initial "stop" of Defendant for investigatory purposes.

## B. MARSHAL BRATHWAITE'S "FRISK" AND/OR "PAT DOWN" OF DEFENDANT'S PERSON AND/OR OUTER GARMENTS FOR WEAPONS WAS LAWFUL.

This Court's analysis does not end with a determination that Marshal Brathwaite had authority to stop Defendant for investigatory purposes on or about May 15, 2009. Rather, the Court must next delve deeper into Marshal Brathwaite's actions to determine whether Marshal Brathwaite's invasion of Defendant's personal security by frisking him for weapons in the course of that investigation was lawful and justified. *Terry*, 88 S. Ct. at 1881.

██ ██ Justification for a "stop" does not necessarily provide justification to "frisk" or "pat down" an individual. The governmental interest in "frisking" is not crime prevention. The greater and more immediate governmental interest is to authorize steps to assure that the person whom law enforcement has "stopped" is not armed with a weapon that could unexpectedly and fatally be used against them. This is especially true given the increased percentage of law enforcement officers that are killed while discharging their duties. The Supreme Court best noted this unfortunate fact when it stated:

> Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives. In

view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. *Terry*, 88 S. Ct. at 1881.

Notwithstanding the immediate interest of the officer, the Court must still consider the "nature and quality of the intrusion" on a defendant's rights. *Id.*

█ Our jurisprudence has made it abundantly clear that "[a] search for weapons in the absence of probable cause to arrest must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." *Warden v. Hayden*, 387 U.S. 294, 310, 87 S. Ct. 1642, 18 L. Ed. 2d 782 (1967). Meaning, the search "*must be limited to that which is necessary for the discovery of weapons* which might be used to harm the officer or others nearby, and may realistically be characterized as something less than a 'full' [exploratory] search." *Terry*, 88 S. Ct. at 1882.

█ A protective search for weapons (commonly referred to as a "frisk" and/or "pat down") is a limited search *done only for detection of a dangerous weapon* in the interest of officer security. *Terry*, 88 S. Ct. at 1882-1883. It by no means authorizes a search for contraband, evidentiary material, or anything else in the absence of probable cause and reasonable grounds to arrest.[8] *Id.* More importantly, "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *See Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 226, 13 L. Ed. 2d 142 (1964); *Brinegar v. United States,* 338 U.S. 160, 174-176, 69 S. Ct. 1302, 1311, 93 L. Ed. 1879 (1949); *Stacey v. Emery*, 97 U.S. 642, 645, 24 L. Ed. 1035 (1878). Further, "in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *See Brinegar v. United States, supra.*

█ In the case *sub judice*, Marshal Brathwaite was alerted by the 911 dispatch that *gunshots* were *fired* and that cars, heading westward in the

---

[8] A full blown search for evidence of a crime ("exploratory search") is a search for contraband, evidentiary material and the like. This search can only he done incident to an arrest and based upon the existence of probable cause, *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

direction of the RLSH, were believed to be transporting *gunshot victims*. Within minutes, Marshal Brathwaite observed three cars speed into the RLSH, of which two were transporting *gunshot victims*. According to Marshal Brathwaite's assertions in his Probable Cause Fact Sheet and testimony at the suppression hearing, the activity of the driver of the third vehicle (Defendant) heightened his suspicion that criminal activity was afoot. Upon Marshal Brathwaite "stopping" and confronting Defendant and identifying himself as a law enforcement officer, Defendant's responses to questions regarding his "odd" behavior did little to dispel Marshal Brathwaite's reasonable suspicion of criminal activity. At this point, the totality of the circumstances made it reasonable for Marshal Brathwaite to suspect that Defendant may be armed (possibly to make a retaliatory "hit" on the persons responsible for his friend's gunshot injuries) and that his [Marshal Brathwaite's] safety or that of others may be in danger. *Ergo*, Marshal Brathwaite's "frisk" and/or "pat down" of Defendant's person and/or outer garments for weapons was justified and lawful.

### C. MARSHAL BRATHWAITE'S "EXPLORATORY" SEARCH OF DEFENDANT'S POCKET AND THE SUBSEQUENT REMOVAL OF BILLETS CONTAINED THEREIN WAS UNCONSTITUTIONAL.

The primary issue germane to the decision in this matter is whether Marshal Brathwaite's "search" of Defendant's pocket and the subsequent removal of the bullets contained therein was constitutional. The Fourth Amendment provides that "the right of the people to be secured in their *persons*, houses, papers and effects, against *unreasonable searches and seizures* shall not be violated." *Terry v. Ohio*, 88 S. Ct. 1868 (1968). This inestimable right of personal security belongs as much to the citizen *on the streets* of our cities as to the *homeowner closeted in his study* to conduct his secret affairs. *Id.* at 1873. In *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507, 511, 19 L. Ed. 2d 576 (1967), the court held that "the *Fourth Amendment protects people, not places*," and wherever an individual may harbor a reasonable "expectation of privacy," he is entitled to be free from *unreasonable* governmental intrusion. *Id.* at 361, 88 S. Ct. at 507.

The specific content and incident of this right must therefore be shaped by the context in which it is asserted because "what the Constitution forbids is not all searches and seizures, but *unreasonable*

searches and seizures." *Elkins v. United States*, 364 U.S. 206, 222, 80 S. Ct. 1437, 1446, 4 L. Ed. 2d 1669 (1960). The question therefore becomes whether in *all* the circumstances of an *on-the-street encounter* with a law enforcement officer, a defendant's right to personal security is violated by an unreasonable search and seizure. *Terry*, 88 S. Ct. at 1873. If a defendant's rights are violated, the exclusionary rule operates to deter and discourage lawless police conduct and maintain judicial integrity by excluding and suppressing evidence seized by law enforcement, in violation of the Fourth Amendment. *Terry*, 88 S. Ct. at 1875.

 Like *Terry*, the case *sub judice* involves an "on the street" confrontation between a citizen and law enforcement investigating suspicious activities and the role of the Fourth Amendment. An officer is authorized, as was the case here, to "stop" the defendant and thereafter conduct a protective search for weapons of the defendant's outer garments, by frisking the defendant or subjecting the defendant to a pat down. The manner in which the stop and frisk/pat down are conducted is critical in order to escape a Fourth Amendment challenge. *Terry*, 88 S. Ct. at 1883. Simply put, the frisk must be "confined in scope to an intrusion reasonably designed to discover *guns, knives, clubs, or other hidden instruments for the assault of the police officer.*" *Terry*, 88 S. Ct. at 1884. In the case under consideration, Marshal Brathwaite's frisk and pat down of Defendant, although not detecting any weapons, nonetheless extended the frisk to an impermissible full blown and/or "exploratory" search of Defendant's pocket, thus raising fundamental problems in light of Fourth Amendment considerations.

According to Defendant, when Marshal Brathwaite "patted" him down for weapons and *felt* bullets in his pocket, Marshal Brathwaite pushed his hand into Defendant's pocket but didn't pull the bullets out. (Trial Transcript dated November 4, 2009 at pp. 63-64). Defendant also testified that Marshal Brathwaite then ordered him to empty his pockets and he complied with said instruction by removing .38 caliber bullets from his pocket and placing the ammunition onto his vehicle. (Trial Transcript dated November 4, 2009 at p. 20; 64). Marshal Brathwaite's version was that he "patted" Defendant down for weapons, felt bullets in Defendant's pocket and asked Defendant "what's this in your pocket," after which, he ordered Defendant to empty his pocket and he complied. (Trial Transcript dated November 4, 2009 at pp. 19-20). Clearly, the Defendant's

compliance with an order made by an armed law enforcement officer could not be construed as "consent."

■■ ■■ Both Marshal Brathwaite and the Defendant concede that while Defendant was being *"patted down" for weapons*, Marshal Brathwaite *only* felt what was believed to be bullets in Defendant's pant pocket. (Trial Transcript dated November 4, 2009 at pp. 19-20). Ordering Defendant to empty his pocket was the functional equivalent of Marshal Brathwaite unlawfully placing his hands in Defendant's pocket and/or under the outer surface of Defendant's garments after failing to discover anything which might have been a weapon.[9] Thus, Marshal Brathwaite's actions constituted an unlawful "search" because a *protective search* after a "pat down" is only warranted if a weapon is detected. Bullets are *not* weapons. V.I. CODE ANN. tit. 14 § 2251(a)(1). Specifically, a bullet is *not* a gun, knife, club, or other instrument that, by its very nature, can assault an officer.

■■ Unlike Marshal Brathwaite, the officer in *Terry* only patted the men down to see whether they had weapons and *he did not put his hand beneath either petitioner's or his codefendant's outer garments until he felt their guns*. *Terry*, 88 S. Ct. at 1872. In fact, the officer in *Terry* confined his search strictly to what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons. *Terry*, 88 S. Ct. at 1884. He *did not conduct a general exploratory search for whatever evidence of criminal activity he might find. Id.* The Supreme Court has made it abundantly clear that law enforcement officials must appropriately restrict protective searches for safely only to the detection of weapons. Marshal Brathwaite went outside and beyond that scope. Accordingly, the search of Defendant's pocket, after the "frisk" did not yield a weapon, was in violation of Defendant's Fourth Amendment guarantees.

---

[9] Although Virgin Islands law does provide for the licensing of firearms, it does not provide for the licensing of ammunition. *U.S. v. Daniel*, 518 F.3d 205, 208, 49 V.I. 1169 (3d Cir. 2008). The clause "unless otherwise authorized by law" in V.I. CODE ANN. tit. 14 § 2256 cannot be construed to create an offense relating to unlawful possession of ammunition not enunciated by the Virgin Islands legislature. *Daniel*, 518 F.3d at 208-209. *See also United States v. Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989 (1954).

### D. Marshal Brathwaite's Protective Search of the Vehicle Driven By Defendant Was Lawful *"but for"* the Intervening, Impermissible "Exploratory" Search of Defendant's Pocket.

When bullets were produced, after impermissibly demanding the Defendant to "empty his pockets," Marshal Brathwaite reasoned that where there are bullets there are firearms. Hence, Marshal Brathwaite searched Defendant's car and indeed located a .38 caliber firearm in a "makeshift compartment" in the driver's door panel. The Defendant was arrested for and was charged with unauthorized possession of a firearm, in violation of V.I. CODE ANN. tit. 14 § 2253(a). (Trial Transcript dated November 4, 2009 at pp. 11; 53-54).

At the suppression hearing, Defendant argued that "[t]he mere fact that bullets were found in [his] left pocket did not justify the search [of his car] nor is it presumptive evidence of a crime" and as such, "[t]he officers had no credible fear for their safety." (Defendant's Motion to Suppress dated June 22, 2009 at p. 3). Defendant further contended that "[w]hen the police officer determined that [he] did not have a weapon on his person, [the] search should have ended." (Defendant's Response dated November 9, 2009 at p. 1). Upon being "frisked" and/or "patted down" for weapons, Defendant was in close proximity to the driver's door of his car. When bullets were detected in Defendant's pocket, it would have been reasonable for Marshal Brathwaite to believe that Defendant was potentially "dangerous" and in close proximity and access to a weapon that was either placed or hidden in his vehicle.

 Although the Court of Appeals for the Third Circuit in *U.S. v. Daniel*, 518 F.3d 205, 208-209, 49 V.I. 1169 (3d Cir. 2008) ruled that possession of ammunition is not unlawful, it stands to reason "where there is smoke, there is often a fire." In other words, where there are bullets and/or ammunition, one can reasonably infer there is often a gun nearby. The law does not require law-enforcement officials to play "Russian roulette" with their lives. Therefore, the principles established in *Michigan v. Long*, 463 U.S. 1032, 103 S. Ct. 3469, 77 L. Ed. 2d 1201 (1983) justify an officer's protective search of a car's passenger compartments where weapons may be placed or hidden whenever the officer possesses a reasonable belief based on "specific" and articulable facts, which taken together with the rational inferences from those facts, that a suspect is dangerous and may gain immediate control of the

weapons, even in the absence of probable cause to arrest, *Long*, 103 S. Ct. at 3481.

In *Long*, two police officers, patrolling in a rural area at night, observed a car traveling erratically and at excessive speed. *Long*, 103 S. Ct. at 3471. When the car swerved into a ditch, the officers stopped to investigate and were met by respondent, the only occupant of the car, on the outside and at the rear of the car. *Id.* Respondent, who "appeared to be under the influence of something," did not respond to initial requests to produce his license and registration, and when he began walking toward the open door of the car, apparently to obtain the registration, the officers followed him and saw a hunting knife on the floorboard of the driver's side of the car. *Id.* The officers then stopped respondent and subjected him to a pat down search, which disclosed no weapons. *Id.* One of the officers shined his flashlight into the car, saw something protruding from under the armrest on the front seat, and upon lifting the armrest saw an open pouch that contained what appeared to be marihuana. *Id.* Respondent was then arrested for possession of marihuana. *Id.*

A further search of the car's interior revealed no more contraband, but the officers decided to impound the vehicle and more marihuana was found in the trunk. *Id.* The Michigan state trial court denied respondent's motion to suppress the marihuana taken from both the car's interior and its trunk, and he was convicted of possession of marihuana. *Id.* at 3471-3472. The Michigan Court of Appeals affirmed, holding that the search of the passenger compartment was valid as a protective search under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889, and that the search of the trunk was valid as an inventory search under *South Dakota v. Opperman*, 428 U.S. 364, 96 S. Ct. 3092, 49 L. Ed. 2d 1000 (1976). *Long*, 103 S. Ct. at 3472.

On appeal from the Michigan Court of Appeals, the Michigan Supreme Court reversed, holding that *Terry* did not justify the passenger compartment search, and that the marihuana found in the trunk was the "fruit" of the illegal search of the car's interior. *Id.* at 3472. However, the U.S. Supreme Court held that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, *is permissible* if the police officer possess a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may

gain immediate control of the weapons. *Id.* at 3481. The Supreme Court declined to determine whether the trunk search of respondent's vehicle was constitutional under the Fourth Amendment because the question was not passed upon by the Michigan Supreme Court. *Id.* at 3483.

Given the Supreme Court's rationale in *Long*, Marshal Brathwaite's protective search of the vehicle driven by Defendant would have been lawful *"but for"* the intervening impermissible "exploratory" search of Defendant's pocket.

### E. THE FIREARM SEIZED WITHIN THE VEHICLE DRIVEN BY DEFENDANT BECAME A "FRUIT OF THE POISONOUS TREE" AND THEREFORE EXCLUDED AND SUPPRESSED AS EVIDENCE.

Under *Long*, Marshal Brathwaite would have been authorized, after "frisking" the Defendant and detecting bullets, to *immediately* [emphasis added] enter Defendant's vehicle and conduct a protective search of the passenger compartments or areas where weapons may be placed or hidden. The People correctly assert that officers are authorized to conduct limited protective searches or "pat downs" of a defendant's person and protective searches of the area(s) beyond a defendant's person, even in the absence of probable cause to arrest, under *Terry* and *Long*, respectively. (People's Opposition to Defendant's Motion to Suppress dated July 29, 2009). The People argue that Marshal Brathwaite stayed within the confines of *Terry* and *Long, ergo,* the search of Defendant's car was lawful. (Supplemental Brief to the People's Opposition to Defendant's Motion to Suppress dated November 13, 2009); (Restatement of Supplemental Brief and Memorandum to the People's Opposition to Defendant's Motion to Suppress with Answers to the Court's Interrogatories dated November 20, 2009).

██ ██ Conspicuously absent from the People's contentions and/or assertions however, is any mention as to the lawfulness of Marshal Brathwaite's *intervening "exploratory" search* of Defendant's pocket. "Exploratory' searches" are full blown searches for evidence of a crime and can only be done incident to an arrest and/or based upon the existence of probable cause. *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). In the case *sub judice*, the "search" of Defendant's pocket was not a protective search, was not done incident to an arrest, and was not supported by probable cause to believe a crime had been committed. Because the intervening "exploratory" search of Defendant's pocket was

46

not limited in scope, it operated to convert the subsequent lawful search of the vehicle driven by Defendant into a search that was subjected to the "poisonous fruit" doctrine. That doctrine requires evidence to be suppressed if seized as a result of a direct or indirect unlawful search. In other words, the permissible protective search of the vehicle driven by Defendant under *Long* only became unlawful and the firearm a product of the "fruit of the poisonous tree" under *Wong Sun v. U.S.*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) because of the preceding unlawful exploratory search of Defendant's pocket. Accordingly, the firearm seized inside the vehicle driven by Defendant is inadmissible and must be suppressed.

## IV. CONCLUSION

The initial "stop" of the Defendant was lawful because Marshal Brathwaite had articulable suspicion that a crime was afoot. The totality of the circumstances also dictated that the Defendant could be armed and dangerous, thus a "pat down" and/or "frisk" of Defendant's person was likewise lawful. As a result of the "pat down," Marshal Brathwaite felt what he believed were bullets and he either went into Defendant's pant pocket to confirm such a belief or ordered the Defendant to remove the contents of his pocket. Either scenario was the functional equivalent to an "exploratory search." Bullets or ammunition do not constitute weapons within the Virgin Islands. Additionally, possession of ammunition alone is not a crime in the Virgin Islands. After feeling bullets, Marshal Brathwaite reasoned "where there is smoke, there is a fire" and, under *Long*, he could have conducted a protective search of the vehicle driven by Defendant and lawfully discovered and seized the firearm hidden in the driver's door panel. However, the unlawful exploratory search of Defendant's person (pocket) made the subsequent search of the vehicle and seizure of the firearm, which would have been otherwise lawful, "fruit[s] of the poisonous tree," resulting in the inadmissibility of the firearm at trial. Accordingly, the Defendant's Motion to Suppress is **GRANTED**.